**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

———————————————————————
                                                    )
**ANTHONY P. HOWARD,**                              )
                                                    )
        **Plaintiff,**                              )
                                                    )        **Civil Action No.**
        **v.**                                      )        **13-12011-FDS**
                                                    )
**CAROLYN W. COLVIN,**                              )
**Acting Commissioner, Social Security**            )
**Administration,**                                 )
                                                    )
        **Defendant.**                              )
———————————————————————)


**MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION TO REVERSE**
**AND REMAND AND DEFENDANT'S MOTION TO AFFIRM**
**THE DECISION OF THE COMMISSIONER**

**SAYLOR, J.**

        This is an appeal of a final decision of the Commissioner of the Social Security

Administration ("SSA") denying the application of plaintiff Anthony P. Howard for

supplemental security income ("SSI") benefits.  Plaintiff appeals the denial of his application on

the ground that the decision is not supported by substantial evidence as required by 42 U.S.C. §

405(g).  Specifically, plaintiff contends that the administrative law judge ("ALJ") improperly

weighed the medical evidence, improperly analyzed plaintiff's credibility, and improperly found

plaintiff capable of performing existing jobs in the national economy.

        Pending before the Court are plaintiff's motion to reverse and remand the

Commissioner's decision and the defendant's motion to affirm the Commissioner's decision.

For the reasons stated below, the decision of the Commissioner will be affirmed, and plaintiff's

motion to reverse and remand will be denied.

# I.    Background

Plaintiff Anthony P. Howard was born on February 26, 1965.  (A.R. at 177).  He is currently 49 years old.  (*Id.*).  He attended school through eleventh grade and later, in 1983, received his GED.  (A.R. at 161).  He was incarcerated for fifteen years after a conviction for armed robbery.  (A.R. at 34-37, 283, 306).  Prior to his incarceration, he worked as a baker at a coffee shop and a cook at a fast-food restaurant.  (A.R. at 161).  He has not worked since December 19, 2011, the alleged onset date of his disability.  (A.R. at 174, 183).

Howard claims disability stemming from asthma, post-traumatic stress disorder, bipolar disorder, major depression, paranoia, and homicidal thoughts directed towards pedophiles.  (A.R. at 58).

## A.    Medical History

### 1.    Asthma

Howard contends that he suffers from asthma.  On December 19, 2011, at the Whittier Street Health Center, Howard saw Kendrah Nealon, N.P.  (A.R. at 220).  Nealon noted that Howard had a history of asthma, but had not experienced an attack in several years.  (A.R. at 220-22).  At this appointment, Nealon counseled him on smoking cessation and advised him that they would discuss the subject further once his depression was better controlled.  (A.R. at 222).

On March 8, 2012, Dr. Madhusudan Thakur examined Howard and described his asthma as "well-controlled without any treatment."  (A.R. at 278-80).  Dr. Thakur also noted that he had a history of daily marijuana use.  (A.R. at 279).  On March 12, 2012, Dr. Debra Rosenblum examined Howard.  (A.R. at 275).  Dr. Rosenblum reported that he smoked one pack of cigarettes per day and used to smoke three packs per day.  (*Id.).*

On June 21, 2012, Howard saw Sarah Grayson, N.P. at the Whittier Health Center. (A.R. at 341). Grayson noted that he had not had an asthma attack in months, but nevertheless she gave him a prescription for an albuterol inhaler. (A.R. at 342-44).[1] She also advised him to stop smoking. (A.R. at 344).

On July 5, 2012, Dr. Mark Siegel of Disability Determination Services completed a physical residual functional capacity ("RFC") assessment of Howard. (A.R. at 78). Dr. Siegel recommended that he avoid exposure to extreme heat or cold, avoid hazards such as machinery and heights, and avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. (*Id.*).

On September 26, 2012, Howard saw Grayson again. (A.R. at 359). Grayson noted that he reported smoking only half a pack of cigarettes per day. (*Id.*). At an appointment a few months later, on November 28, 2012, Grayson noted that Howard was still smoking, that she stressed to him the importance of smoking cessation, and that he reported using albuterol daily for asthma. (A.R. at 401).

## 2. Other Physical Impairments

Howard also contends that he has neck pain and arm numbness. On March 8, 2012, Howard had a consultative examination with Dr. Thakur, who noted that he complained of pain on the left side of his neck when moving his neck to the left and pain in the back of his neck on extension. (A.R. at 279). Dr. Thakur also noted that the arm numbness could be related to

---

[1] Albuterol inhalers are quick-relief medicines used to treat asthma in the event of an asthma attack. Albuterol helps muscles in the airway to relax, opening up the airway. Common triggers of asthma attacks are changes in temperature, dust, tobacco smoke, and air pollution. Tobacco smoke can exacerbate asthma. *See* Nat'l Inst. of Health, *Asthma*, MEDILINE PLUS (June 6, 2014, 4:22 PM), http://familydoctor.org/familydoctor/en/diseases-conditions/asthma.printerview.all.html.

cervical spinal arthritis. (A.R. at 280).[2] In addition, Dr. Thakur found that his vision was excellent, despite his complaints that he could not see properly. (A.R. at 280, 283).

During an appointment on June 21, 2012, Grayson noted that Howard had a history of neck pain with associated numbness in his left arm. (A.R. at 340-44). She also noted he had tenderness upon palpation of his cervical spine but normal mobility of both his neck and head. (*Id.*). Grayson further reported that his strength in both his upper and lower extremities was a five, on a five-point scale, and that he had a steady gait. (*Id.*).

In a July 5, 2012 physical RFC assessment, Dr. Siegel reported that Howard could lift ten pounds frequently and twenty pounds occasionally, that he could stand and/or walk for six hours in an eight-hour work day, that he could sit for six hours in an eight-hour work day, and that he could occasionally climb, balance, stoop, kneel, crouch, and crawl. (A.R. at 77-78). Dr. Siegel also noted that he was limited in right and left overhead reaching. (*Id.*). Dr. Siegel concluded that he was capable of light work and could hold occupations such as winder, electronic worker, or encapsulator. (A.R. at 81).

On August 28, 2012, Grayson noted that Howard had lumbar tenderness. (A.R. at 377). She also referred him to a nutritionist for obesity. (*Id.*).

On September 20, 2012, Dr. Olarewaju Oladipo at the Whittier Street Health Center examined Howard and noted that he was experiencing some pain with activity, but that his lower back and neck pain had improved with treatment. (A.R. at 362). Dr. Oladipo diagnosed cervical

---

[2] Cervical spine arthritis is "an inflammation of one or more joints of the cervical spine," which is located between the shoulders and the base of the skull. *See* Michael Perry, M.D., *Cervical Spine Arthritis*, LASER SPINE INSTITUTE (June 6, 2014, 4:36 PM), http://www.laserspineinstitute.com/back_problems/arthritis_of_the_spine/ cervical_spine_arthritis/.

degenerative joint disease and degenerative joint disease at lumbar L5-S1.  (A.R. at 362).[3]

On November 28, 2012,  Grayson noted that Howard complained of stomach cramps occurring over the past several days.  (A.R. at 399).  She also reported that he had a steady gait and had lost ten pounds after seeing a nutritionist for his obesity.  (A.R. at 401).

On December 11, 2012, Grayson filled out an RFC questionnaire, in which she indicated that Howard could sit or stand/walk for eight hours in an eight-hour work day without unscheduled breaks, but that his impairments would frequently interfere with the attention and concentration required to perform work-related tasks.  (A.R. at 393).  She further indicated that he could frequently lift or carry less then ten pounds and could occasionally carry ten, twenty, and fifty pounds.  (A.R. at 394).

### 3.    Mental Impairments

Howard also contends that he suffers from post-traumatic stress disorder, bipolar disorder, major depression, paranoia, and homicidal thoughts directed towards pedophiles.

On December 19, 2011, Howard saw Barbara Cherry, M.S., of Priority Professional Care. Cherry noted that Howard has anger-management problems manifested by a "hot temper" and "angry behaviors that are out of proportion to the provocation."  (A.R. at 224).  She also reported that he had homicidal ideas about killing pedophiles.  (A.R. at 235).  The following day, she noted that his anger-management problems had interfered with his social functioning and his ability to stay employed.  (A.R. at 237).   Cherry also reported that he had symptoms of

---

[3] Cervical degenerative joint disease is also known as cervical osteoarthritis, cervical spondylosis, or chronic neck pain.  It is caused by "chronic wear on the cervical spine."  Common symptoms are neck stiffness, numbness in the arms or shoulders, and headaches.  Common tests are a physical exam to see if the patient has trouble moving or rotating the head and an MRI when the patient experiences numbness in the arms or hands. *See* Nat'l Inst. of Health, *Cervical spondylosis*, MEDILINE PLUS (June 9, 2014, 1:10 PM), http://www.nlm.nih.gov/medlineplus/ency/article/000436.htm.

depressive disorder because "signs of moderate depression [were] present" and that he had complained of insomnia. (A.R. at 237-39). She further reported that his social judgment was poor but that his cognitive function, fund of knowledge, and memory were intact. (A.R. at 239).

On January 5, 2012, Brenda Rogers, R.N., gave Howard a prescription for Clonidine for anxiety and Trazodone for insomnia. (A.R. at 266).[4] He did not attend the corresponding follow-up appointment that had been scheduled for January 12, 2012. (A.R. at 259).

On January 23, 2012, Cherry diagnosed bipolar disorder and opiate abuse and noted that Howard continued to complain of insomnia. (A.R. at 254).[5]

On March 12, 2012, Dr. Rosenblum conducted a consultative examination for the Social Security Administration. (A.R. at 274-77). She diagnosed post-traumatic stress disorder and ruled out a diagnosis of bipolar disorder. (A.R. at 276).[6] She also reported that Howard would benefit from increased out-patient mental health treatment to address his level of anger and mood stability. (*Id.*).

On June 21, 2012, Grayson diagnosed bipolar disorder and prescribed medication. She noted that Howard did not appear depressed, anxious, or agitated at the time of his visit. (A.R. at 343-44).

---

[4] Clonidine is used primarily to treat high blood pressure, but has been used for opiate withdrawal. *See* Nat'l Inst. of Health, *Clonidine*, MEDLINE PLUS (June 9, 2014, 1:15 PM), http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682243.html. Trazodone typically is used to treat depression, but can also be used to treat insomnia and anxiety. *See* Nat'l Inst. of Health, *Trazodone*, MEDLINE PLUS (June 9, 2014, 2:15 PM), http://www.nlm.nih.gov/medlineplus/ druginfo/meds/a681038.html.

[5] Bipolar disorder is a mental illness that causes people to have unusual mood changes, going from very happy to sad and hopeless. Bipolar disorder is generally a lifelong illness. *See* Nat'l Inst. of Health, *Bipolar Disorder*, MEDLINE PLUS (June 9, 2014, 2:25 PM), http://www.nlm.nih.gov/medlineplus/bipolardisorder.html.

[6] PTSD can occur after living through or seeing a traumatic event. PTSD can cause various problems, including feelings of stress, fear, guilt, anger, and loneliness, as well as insomnia. *See* Nat'l Inst. of Health, *Post-Traumatic Stress Disorder*, MEDLINE PLUS (July 14, 2014, 11:23 AM), http://www.nlm.nih.gov/medlineplus/posttraumaticstressdisorder.html.

On July 17, 2012, Dr. Robert Lasky of Disability Determination Services completed a psychiatric review technique form about Howard. (A.R. at 79-80). He indicated that Howard did not have any memory or understanding limitations or any sustained concentration and persistence limitations, but that he did have social interaction limitations. (A.R. at 79). Dr. Lasky described him as moderately limited in his ability to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, and to get along with coworkers and peers. (A.R. at 79). Dr. Lasky further concluded that he was not significantly limited in his ability to ask simple questions or request assistance and was not significantly limited in his ability to maintain socially appropriate behavior. (A.R. at 79-80). Dr. Lasky also noted that he "[a]ppears to embellish anger issues." (A.R. at 80). Dr. Lasky concluded that he would be "able to adapt to routine change after a brief period of adjustment," but that he was very likely to resist this change and his motivation appeared low. (A.R. at 80). Dr. Lasky diagnosed PTSD, a personality disorder, a substance-addiction disorder, and a mood disorder, which he noted may be related to substance abuse. (A.R. at 80).

On August 28, 2012, Howard again saw Grayson, who again found that he did not appear depressed, anxious, or agitated. (A.R. at 377). She made similar findings on November 28, 2012. (A.R. at 401).

Grayson completed an RFC questionnaire on December 11, 2012. (A.R. at 393-394). She indicated that Howard suffered from bipolar disorder and depression with symptoms of "auditory hallucinations" and "thoughts of hurting others." (A.R. at 17, 393-394). She further indicated that, as a result of his impairments, he would likely be absent from work more than four times a month and that he was not capable of working eight-hour days, five days per week on a sustained basis. (A.R. at 394).

4. **Substance Abuse**

Howard has a history of opiate and marijuana abuse. On December 19, 2011, Cherry noted that his substance abuse, primarily heroin abuse, was an active problem in need of treatment. (A.R. at 225). The following day, Cherry reported that he had abused heroin for many years, that the frequency of use was multiple times per day, and that he had last used heroin two weeks prior to this appointment. (A.R. at 237). Cherry reported that because of his drug use, he had lost his job and became homeless. (A.R. at 237). She also reported that he had never received any out-patient or in-patient treatment for substance abuse. (*Id.*).

At an examination on March 12, 2012, Dr. Rosenblum noted that Howard had sniffed heroin occasionally in the past and used marijuana throughout his life. (A.R. at 275).

On July 17, 2012, Dr. Lasky noted that Howard actively abused marijuana and that it was unclear if his heroin abuse was ongoing. (A.R. at 80). Dr. Lasky also reported a "credibility issue re[garding] self-report of substance use." (*Id.*).

On September 26, 2012, Grayson noted that Howard had been drug-free since January 2012. (A.R. at 359). On January 22, 2013, he testified before the ALJ that he had been "clean" since spring of 2012. (A.R. at 36).

B. **Function Report and Testimony**

Howard completed a written function report on June 20, 2012. (A.R. at 193). He indicated that he watches television and reads newspapers throughout the day. (A.R. at 190). He is able to prepare his own meals, such as soups and sandwiches. (A.R. at 188). He is able to shop in stores, which he gets to either by walking or by public transportation. (A.R. at 190). He can walk for one half-mile before needing to rest for five minutes. (A.R. at 191). He reported that he has difficulty being around others, does not get along with authority figures, and does not

handle stress well because he is "very inpatient [sic]."  (A.R. at 186, 192).  He also indicated that his condition affected his ability to lift, squat, bend, stand, walk, climb stairs, complete tasks, concentrate, use his hands, and get along with others.  (A.R. at 191).  When asked to explain how his mental and physical condition affect his abilities, he wrote "I guess inpatients [sic] ."  (A.R. at 191).

At the January 22, 2013 hearing before the ALJ, Howard testified that he was currently taking Trazodone, Seroquel, and Clonidine, and that he was not experiencing any side effects from those medications.  (A.R. at 39).[7]  He testified that while he had a history of substance abuse, he had been clean and sober since the spring of 2012.  (A.R. at 36).  He described his pain as a nine on a ten-point scale and stated that he could sit in a chair for ten minutes at a time.  (A.R. at 45).  He also stated that he has anger issues and often becomes confrontational.  (A.R. at 47-54).  He noted that he had been incarcerated for fifteen years, nine of which, according to him, he spent in solitary confinement, and that during his incarceration, his daughter was molested and therefore he has "major issues with pedophiles."  (A.R. at 34).  He testified that he meets with a probation officer twice per month in relation to a recent marijuana charge.  (A.R. at 35, 44).  He also testified that he was living at a homeless shelter, in a dormitory with eight other individuals, and that he uses the bus for transportation.  (A.R. at 36-38).

## II.    Procedural History

Howard filed an application for SSI benefits on December 19, 2011, claiming disability based on asthma, post-traumatic stress disorder, bipolar disorder, major depression, and

---

[7] At the hearing, plaintiff, in fact, stated that he was taking Trazodone, Seroquel, and "Collodidine," by which he presumably meant Clonidine.  (*See* A.R. at 39).  Seroquel is a brand of quetiapine used to treat depression in patients with bipolar disorder.  *See* Nat'l Inst. of Health, *Quetiapine*, MEDLINE PLUS (June 9, 2014, 3:54 PM), http://www.nlm.nih.gov/medlineplus/ druginfo/meds/a698019.html.

homicidal thoughts directed towards pedophiles.  (A.R. at 143-51, 160, 174).  On April 30, 2012, the Social Security Administration denied his initial application.  (A.R. at 58-69, 84-86).  On July 18, 2012, the SSA also denied his application upon reconsideration.  (A.R. at 70-83, 90-92).  He then requested a hearing before an Administrative Law Judge.  (A.R. at 62-64).  On January 22, 2013, the ALJ held a hearing, and on March 4, 2013, denied the application.  (A.R. at 11-24).  He appealed to the Appeals Council, which denied his request for review on May 20, 2013.  (A.R. at 1-4, 8).

On August 21, 2013, Howard filed a complaint in this Court.  On January 22, 2014, he filed a motion for an order to reverse and remand the Commissioner's decision.  On April 4, 2014, the Commissioner moved to affirm the decision.

## III.    **Analysis**

### A.    **Standard of Review**

Under the Social Security Act, this Court may affirm, modify, or reverse the final decision of the Commissioner, with or without remanding the case for a rehearing.  42 U.S.C. § 405(g). The denial of social security disability benefits must be upheld if it is supported by substantial evidence and the Commissioner has applied the correct legal standard.  42 U.S.C. § 405(g); *Manso-Pizzaro v. Sec'y of Health and Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996). The Commissioner's factual findings are conclusive "if supported by substantial evidence."  42 U.S.C. § 405(g).  The Commissioner, and not the reviewing Court, is responsible for "weighing conflicting evidence, where reasonable minds could differ as to the outcome."  *Seavey v. Barnhart*, 276 F.3d 1, 10 (1st Cir. 2001).  Therefore, this Court must accept the factual findings of the Commissioner "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion," even where the record could justify a

different conclusion. *Rodriguez v. Sec'y of Health and Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981); *see also Evangelista v. Sec'y of Health and Human Servs.*, 826 F.2d 136, 144 (1st Cir. 1987). This court's review of the Commissioner's decision "is limited to determining whether the [Commissioner] used the proper legal standards, and found facts based on the proper quantum of evidence." *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000). Questions of law, to the extent that they are at issue in this appeal, are reviewed *de novo*. *Seavey*, 276 F.3d at 9.

### B. Standard for Entitlement to SSI Benefits

An individual is not entitled to SSDI benefits unless she is "disabled" within the meaning of the Social Security Act. *See* 42 U.S.C. § 423(a)(1)(A), (d) (setting forth the definition of disabled in the context of SSDI). "Disability" is defined, in relevant part, as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be severe enough to prevent the plaintiff from performing not only past work, but any substantial gainful work existing in the national economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1560(c)(1), 416.960(c)(1).

The Commissioner uses a sequential five-step process analysis to evaluate whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The steps are:

> 1) if the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the applicant does not have, or has not had . . . a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the 'listed impairments' in the Social Security regulations, then the application is granted; 4) if the applicant's 'residual functional capacity' is such that [s]he . . . can still perform past relevant work, then the application is denied; 5) if the applicant, given his or her residual functional capacity, education, work

experience, and age, is unable to do any other work, the application is granted. *Seavey*, 276 F.3d at 5; *see* 20 C.F.R. § 404.1520(a)(4).[8] "The applicant has the burden of production and proof at the first four steps of the process," and the burden shifts to the Commissioner at step five to "com[e] forward with evidence of specific jobs in the national economy that the applicant can still perform." *Freeman v. Barnhart*, 274 F.3d 606, 608 (1st Cir. 2001). At that juncture, the ALJ assesses the claimant's RFC in combination with the "vocational factors of [the claimant's] age, education, and work experience," 20 C.F.R. § 404.1560(c)(1), to determine whether he or she can "engage in any . . . kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

### C.     The Administrative Law Judge's Findings

The ALJ followed the five-step procedure set forth in 20 C.F.R. § 404.1520(a)(4) to determine whether plaintiff had been under a disability from the alleged disability onset date through the date of the decision. (A.R. at 13-14).

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since December 19, 2011 the alleged onset date. (A.R. at 16).

At step two, the ALJ found that plaintiff had the following severe impairments: "bipolar disorder, post traumatic stress disorder, substance abuse, personality disorder, asthma, cervical spinal arthritis, cervical spine degenerative joint disease and degenerative joint disease at the L5/S1 spinal level." (A.R. at 16).

At step three, the ALJ determined that plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed

---

[8] "All five steps are not applied to every applicant, as the determination may be concluded at any step along the process." *Seavey*, 276 F.3d at 5.

impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (A.R. at 19).  In the residual

functional capacity assessment of plaintiff, the ALJ determined that plaintiff has the ability to

perform light work, but that he can only occasionally climb, balance, stoop, kneel, crouch, crawl,

and reach overhead bilaterally.  (A.R. at 20).  The ALJ found that plaintiff must avoid exposure

to extreme temperatures, concentrated exposure to hazards such as machinery and heights, and

concentrated exposure to fumes, odors, dust, gases, and poor ventilation.  (*Id.*).  In addition, the

ALJ found that plaintiff can only have occasional interaction with the general public, co-

workers, and supervisors, and that he can perform work that would only involve minor changes

in the work setting.  (*Id.*).  However, he stated that plaintiff has no limitations with respect to his

understanding, his memory, his ability to sustain concentration, and his persistence.  (*Id.*).

At step four, the ALJ found that plaintiff had no relevant work experience.  (A.R. at 22).

The ALJ therefore proceeded to the fifth and final step.  (*Id.*).  As to the vocational factors, the

ALJ found that plaintiff was 46 years old when he filed the application for benefits; that he had

completed at least a high-school education; and that he had no skills to consider for

transferability because he had no past relevant work.  (A.R. at 22-23).  Considering those

vocational factors and plaintiff's residual functional capacity, the ALJ determined that jobs exist

in significant numbers in the national economy that plaintiff can perform—for example, winder,

electronic worker, and encapsulator.  (A.R. at 23).  The ALJ therefore concluded that plaintiff

had not been disabled, as defined in the Social Security Act, since December 19, 2011.  (A.R. at

23).

### D.      Analysis of Plaintiff's Objections

Plaintiff raises three objections to the ALJ's determination.  He contends that (1) the

ALJ's RFC determination is not supported by substantial evidence; (2) the ALJ improperly

found him not credible; and (3) the ALJ's finding at step five is not supported by substantial evidence.

### 1.   Determination as to Plaintiff's Residual Functional Capacity

Plaintiff first contends that the ALJ's RFC determination is not supported by substantial evidence because the ALJ improperly accorded controlling weight to the findings of Drs. Siegel and Lasky. Plaintiff further contends that Drs. Siegel and Lasky did not consider all of the evidence, specifically later treatment reports, in rendering their opinions.

An ALJ's determination of a claimant's residual functional capacity must be supported by substantial evidence. *Seavey*, 276 F.3d at 10. Substantial evidence means that there is "more than a mere scintilla" of evidence, such that a reasonable mind could accept the evidence as "adequate to support" the ALJ's conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

"Since bare medical findings are unintelligible to a lay person in terms of residual functional capacity, the ALJ is not qualified to assess claimant's residual functional capacity based on the bare medical record." *Berrios Lopez v. Sec'y of Health & Human Servs.*, 951 F.2d 427, 430 (1st Cir. 1991). The ALJ must rely on the reports of physicians in the record to make an RFC determination. *Id.* SSA regulations state that licensed physicians and psychologists are among the "acceptable medical sources" who can provide evidence at an impairment, and that their opinions may be weighed more heavily than evidence from "other sources," such as nurse practitioners. 20 C.F.R. §§ 404.1527(d)(4), 416.913(a), 416.927(d)(4). SSA regulations further require an ALJ to consider the opinions of non-examining agency medical consultants, although they counsel that such opinions should not be granted controlling weight. *See* SSR 96-2P, 96-6P (S.S.A. July 2, 1996). While the written report of a "non-testifying, non-examining physician who merely reviewed the written medical evidence [can]not alone constitute substantial

evidence," it is entitled to some weight. *Berrios Lopez*, 951 F.2d at 431. The evidentiary weight that an advisory report is entitled to "will vary with the circumstances including the nature of the illness and the information provided [to] the expert." *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 224 (1st Cir. 1981). The report of an advisory physician may be considered substantial evidence if the physician had access to most of the medical evidence for their review and if the reports of multiple physicians "tend somewhat to reinforce each other's conclusions." *Berrios Lopez*, 951 F.2d at 431.

The written opinion of a non-examining, non-testifying physician will be considered substantial evidence if it is supported by other evidence in the record. *See Tremblay v. Sec'y of Health & Human Servs.*, 676 F.2d 11, 13 (1st Cir. 1982). Thus, the ALJ's conclusion may be based upon the reports of a non-examining, non-testifying physician when "the record contains considerable evidence that would allow a reasonable person to" reach the same conclusion. *Rodriguez*, 647 F.2d at 223 (examples of supporting evidence in the record included medical test results and reports of psychiatric and physical medical examinations). In addition, the ALJ has broad discretion to resolve conflicts in the medical record. *See Tremblay*, 676 F.2d at 12-13 (finding that the ALJ had the discretion to adopt the view of the non-examining physician when it was supported by substantial evidence, even where the report of the non-examining physician contradicted the report of the examining physician).

Here, it does not appear that the ALJ gave controlling weight to the opinions of Drs. Lasky and Siegel. While the ALJ's findings are in accord with their opinions, that fact alone does not establish that the ALJ gave those opinions improper or undue weight. Instead, it appears that the ALJ's conclusions and the conclusions of Drs. Lasky and Siegel are both drawn from the evidence in the record and substantially supported by that evidence. In addition to the

opinions of Drs. Lasky and Siegel, the ALJ considered plaintiff's own testimony and self-completed functional capacity report, the consultative examination of Dr. Rosenblum, and the report of plaintiff's treating physician, Dr. Oladipo.  (A.R. at 21-22).

Furthermore, the ALJ's decision explains in detail the reasons for affording certain sources more weight than others.  (A.R. at 21-22).  For example, as "acceptable medical sources," Drs. Lasky and Siegel may provide opinions that are entitled to greater weight.  *See Taylor v. Astrue*, 899 F. Supp. 2d 83, 88 (D. Mass. 2012); *see also* 20 C.F.R. § 416.913.  The ALJ gave due consideration to the observations and opinions of Grayson, Rogers, and Cherry.  (*See* A.R. at 22).  The ALJ correctly recognized that those providers qualify as "other" medical sources, not treating sources, and thus the ALJ was within his discretion in granting less weight to those sources.  *Id.*; *see Tremblay*, 676 F.2d at 12; *see also* 20 C.F.R. § 404. 1502.  Furthermore, on the whole, the opinions of Grayson, Rogers, and Cherry are consistent with the opinions of Drs. Lasky and Siegel.  Thus, the ALJ's reliance on the reports of Drs. Lasky and Siegel does not establish that other evidence was ignored.

Grayson's December 2012 RFC evaluation was granted little evidentiary weight because the extreme limitations described in the evaluation were not only inconsistent with the plaintiff's medical record as a whole, but were also inconsistent with the prior reports of Grayson herself.  (A.R. at 22).  That determination was appropriate because it is within the ALJ's discretion to weigh and resolve conflicting evidence in the record.  *See Tremblay*, 676 F.2d at 12.

Plaintiff's contention that the ALJ improperly relied upon the reports of Drs. Lasky and Siegel because those reports did not include later evidence is unavailing.  First, the ALJ himself considered Dr. Oladipo's later report, which in part indicated that plaintiff's neck and back pain had improved.  Second, because Dr. Oladipo's report did not reveal any additional physical or

mental limitation, Dr. Siegel's earlier opinion remained accurate, despite the new evidence.  *See Abubakar v. Astrue*, 2012 WL 957623, at *12 (D. Mass Mar. 21, 2012) (finding that the ALJ could rely on the information in order reports when subsequent reports did not reveal a further limitation of plaintiff).  Thus, the ALJ properly relied on the older opinion because it continued to provide accurate information regarding plaintiff's limitations.

Viewed as a whole, it appears that the ALJ considered evidence from multiple sources, did not solely rely upon the reports of non-examining sources, and rendered a decision based upon the entire record.  Therefore, the ALJ's residual functional capacity determination is supported by substantial evidence in the record and will be affirmed.

## 2. <u>Determination as to Plaintiff's Credibility</u>

Plaintiff next contends that the ALJ improperly questioned his credibility.  Specifically, he asserts that the ALJ erroneously determined that his "statements concerning the intensity, persistence, and limiting effects of [his] symptoms are not entirely credible."  (A.R. at 21).

The ALJ is responsible for deciding on "issues of credibility" and drawing "permissible inference[s] from evidentiary facts."  *Rodriguez*, 647 F.2d at 222 (quoting *Rodriguez v. Celebrezze*, 349 F.2d 494, 496 (1st Cir. 1965)).  An ALJ may find that a claimant's testimony is not credible if the ALJ supports such conclusion with "substantial evidence" and makes specific findings as to the "relevant evidence" considered in coming to that conclusion.  *Da Rosa v. Sec'y of Health & Human Servs.*, 803 F.2d 24, 26 (1st Cir. 1986).

Here, the ALJ stated that plaintiff's difficulty being around people "does not appear credible to the extent alleged."  (A.R. at 21).  Plaintiff testified that he has difficulty being around people, particularly in a work environment.  ( *Id.*).  However, other record evidence does not establish that he is incapable of working with other people, in a work environment or in

general. The ALJ's decision points to numerous occasions upon which plaintiff's alleged symptoms were not so severe as to prevent him from interacting with others. (A.R. at 21-22). For example, plaintiff shops in stores for basic necessities and takes public transportation to attend appointments. (A.R. at 21). Plaintiff contends that, besides interactions to attain necessities, he avoids interacting with people. While that may be true, the ability when necessary to interact with others demonstrates that plaintiff has the capacity to do so.

The ALJ further determined that plaintiff's "allegations that he was physically incapable of performing any type of work activity are not credible to the extent alleged." (A.R. at 21). In support of his determination, the ALJ pointed to evidence in the plaintiff's self-completed functional capacity report regarding plaintiff's ability to walk a half mile without a break, to prepare his own meals, and to do his own shopping. (A.R. at 21). Other evidence in the record likewise called into question plaintiff's credibility. For example, Dr. Lasky noted in his July 17, 2012 report that plaintiff appeared to embellish his anger issues and that there was a potential credibility issue relating to his status reports on his substance abuse. (A.R. at 80). Also, plaintiff's January 2013 testimony that his pain was a nine on a ten-point scale was inconsistent with Dr. Oladipo's September 2012 report that plaintiff's condition had been improving with treatment. (A.R. at 45, 362).

In summary, the ALJ's determination is supported by substantial evidence and the ALJ made specific findings as to the relevant evidence from plaintiff's testimony and medical record. Accordingly, the ALJ's findings as to plaintiff's credibility were not improper or unfounded.

### 3. Finding at Step Five

Plaintiff further contends that the ALJ's finding at step five of the disability analysis was

erroneous because he cannot perform the full range of light work and because the ALJ failed to perform a proper analysis of how his additional limitations affect his ability to perform light work.  He asserts that the ALJ should have consulted with a vocational expert about the impact of his non-exertional limitations on his potential job base.  He also contends that he cannot engage in unskilled work because he does not have the level of language skill required for the occupations listed by the ALJ.

At step five of the disability analysis, the Commissioner has the burden of coming forward with evidence of specific jobs in the national economy that the claimant can perform. *Seavey*, 276 F.3d at 5.  When a claimant is limited by certain factors and is not capable of the full range of light work, an ALJ must consider all relevant facts in making a disability determination, including expert vocational testimony if necessary.  *Gagnon v. Sec'y of Health & Human Servs.*, 666 F.2d 662, 666 (1st Cir. 1981).  When additional limitations exist, such as avoiding certain temperatures and exposure to dust and fumes, the ALJ must make an explicit finding as to whether and to what extent the claimant's work capacity is diminished.  *Id.*

The ALJ may use the SSA guidelines as a framework for determining the extent to which a claimant's work capacity is diminished.  *Ortiz v. Sec'y of Health & Human Servs.*, 890 F.2d 520, 524 (1st Cir. 1989).  In cases where non-exertional limitations "more than marginally erode the range of work available to the applicant in an established category," the ALJ should consult a vocational expert.  *Roman-Roman*, 114 Fed. Appx. at 412 (for example, where significant, limiting mental constraints were described in even the most positive assessments of the claimant).  However, when the non-exertional limitations do not impose a significant restriction on the claimant's exertional ability to perform work, then an ALJ may still rely on the SSA guidelines to establish that jobs exist which the claimant can perform.  *Ortiz*, 890 F.2d at 524.

Thus, "if a non-strength impairment, even though considered significant, has the effect only of reducing that occupational base marginally," then the SSA guidelines remain "highly relevant and can be relied on exclusively to yield a finding as to disability." *Id.*

Here, in making the step-five determination, the ALJ considered plaintiff's age, education, work experience, and residual functional capacity, including his non-exertional limitations. (A.R. at 23). After analyzing these factors, the ALJ determined that plaintiff's additional non-exertional limitations had "little or no effect on the occupational base of unskilled light work." (*Id.*). The ALJ further decided that it was unnecessary to consult a vocational expert in this case because plaintiff's non-exertional limitations had only a marginal effect on the range of work available to him. (*Id.*). The ALJ considered all the relevant evidence and thus this determination was not erroneous.

Plaintiff further contends that he does not have the language skills required for the suggested occupations, citing to Cherry's estimation that he could only read at an eighth-grade level. He contends that the occupations of electronic worker and encapsulator require a language level of 2, which is purportedly beyond an eighth-grade capacity. Plaintiff has stated on the record that he obtained a GED in 1983, which indicates that his language abilities are at least at the level of a twelfth-grader. (A.R. at 161). Further, he stated in his function report that he frequently reads newspapers. (A.R. at 190). Thus, his contention that the listed occupations are beyond his language skill level lacks a basis in the facts in the record.

In sum, the record substantially supports the ALJ's determination at step five of the disability analysis, and accordingly, that determination will be affirmed.

**IV.** **Conclusion**

For the foregoing reasons, plaintiff's motion for an order reversing and remanding the

final decision of the Commissioner of the Social Security Administration is DENIED, and

defendant's motion for an order affirming the decision of the Commissioner is GRANTED.

**So Ordered.**

    /s/ F. Dennis Saylor
    F. Dennis Saylor IV
    United States District Judge

Dated: October 22, 2014